Robert B. Gotfredson and Charlotte B. Gotfredson v. Commissioner.
Gotfredson v. Commissioner
Docket Nos. 37413, 38407.
United States Tax Court
1953 Tax Ct. Memo LEXIS 127; 12 T.C.M. (CCH) 1007; T.C.M. (RIA) 53289; August 31, 1953
*127 Nathaniel W. Gold, Esq., 1724 Ford Building, Detroit, Mich., for the petitioners. Charles S. Gray, Esq., for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: The respondent determined deficiencies in income tax of the petitioners as follows: Docket No.
Year
Deficiency
37413
1948
$7,567.54
38407
1949
7,769.26
The issues presented for determination are the correctness of the respondent's action (1) in disallowing a deduction taken for 1948 for a non-business bad debt and (2) in determining that the gains realized in 1948 and 1949 from the sale of certain cattle held for six months or more constituted ordinary income. Findings of Fact The petitioners are husband and wife, residents of Detroit, Michigan, and filed their joint income tax returns for 1948 and 1949, prepared on the cash basis, with the collector for the district of Michigan. For a number of years prior to 1948 Robert B. Gotfredson, sometimes hereinafter referred to as the petitioner, had known Frank Nolan, an attorney engaged in the practice of law in Detroit. On two occasions prior to May 1948 petitioner made loans to Nolan and each loan was *128 repaid by Nolan in accordance with his promise. Neither the amounts of the loans nor whether they were secured is disclosed. Early in May 1948 Nolan approached petitioner for a loan of $1,500 for 30 days, stating that he owned some stock in a company engaged in the manufacture of buses and that he expected to repay the loan with dividends to be received on the stock. On May 7, 1948, petitioner loaned Nolan $1,500 and received Nolan's unsecured promissory note of that date, due 30 days thereafter, and bearing interest at 6 per cent per annum. On or about the time the note became due Nolan requested the petitioner to extend the time of payment, which petitioner did. Several months later Nolan advised petitioner of his receipt of information that the company in which he owned the stock was going to pass its dividend and that he would be unable to pay the note. Later, in 1948, Nolan advised petitioner that the company had passed the dividend. He also told petitioner that he had no assets which he could use to pay the note, that the stock was pledged as collateral to a bank to which he was also indebted, that the bank was pressing for payment, and asked petitioner for assistance in paying *129 the bank. Petitioner declined to assist him. During 1948 the petitioner obtained some credit information about the company in which Nolan owned stock and concluded that the company was operating at a loss and was having financial difficulties. Upon the basis of the information he had obtained about the company, and from what he had been told by Nolan, the petitioner concluded in 1948 that Nolan's indebtedness to him had become worthless and that resort to litigation to collect it would not be productive of collection. Except for what Nolan had told him, the petitioner had no knowledge in 1948 as to whether Nolan owned any personal property other than the stock or whether he owned the house in which he lived or owned any other real property. Nolan continued to practice law in Detroit during 1949 and into 1950, when he died. Petitioner talked with him three or four times in 1949 and once or twice in 1950. On none of these occasions did Nolan give petitioner any indication that he intended to pay the note. Neither prior to, nor since, the death of Nolan has petitioner ever received anything with respect to the note. The records of the Probate Court of Wayne County, Michigan, located *130 in the city of Detroit, do not disclose the probate of a will of Nolan or an administration of any estate of his. In determining the deficiency for 1948 the respondent disallowed a deduction of $1,500 taken by petitioners as a non-business bad debt resulting from the loan to Nolan. Since about 1940 the petitioner has owned and operated what is known as the "Gotfredson Farms," which consists of about 1,500 acres situated at Grass Lake, Jackson County, Michigan. The principal source of income from the operation of the farm has been from the sale of dairy products. About 85 per cent of the feed required for the cattle is grown on the farm and the remainder is purchased. In 1948 and 1949 approximately 20 per cent of the total acreage of the farm was devoted to pasture. During years with rainfall normal for the growth of feed and pasture, the farm is capable of maintaining about 325 head of cattle. In an effort to place the farm on a profitable basis, the petitioner early adopted the policy of building up a herd of top grade milk-producing cattle of the Brown Swiss breed to the point of maximum operational efficiency on the acreage available. The Brown Swiss breed is not a dualpurpose *131 breed in that it is considered a milk producer primarily, and not a beef producer. In maintaining and improving the efficiency of his dairy herd, the petitioner culls out the less desirable animals, replaces with younger animals raised on the farm the older animals whose production has dropped, and from time to time acquired new sires from other herds. Of the animals born on the farm each year the petitioner intends to retain as many as he thinks he can use. However, his aim is to retain the better ones and continually cull out the poor ones in order to improve the quality of his herd. During 1948 and 1949 some of the cattle raised on the farm were sold before attaining the age of six months. Other cattle were retained beyond that age and it is some of the latter group which are involved here. In selecting cattle which are to be retained for milk production purposes, the petitioner maintains a standard. Under that standard a heifer must be of good conformation and at first calving, as a two-year old, produce at least approximately 300 pounds of butter fat a year. The fact that her production of butter fat with her first calf may be less than 300 pounds is not entirely determinative *132 of her retention as her production might increase with subsequent gestations where her dam and sire were of lines of good producers of butter fat. Under the petitioner's standard for retention, a bull must be of good conformation, a sure breeder, and be from a dam which has produced 500 pounds of butter fat a year. Not until the offspring of a bull begins milking is petitioner finally able to determine whether a bull fully meets petitioner's standards and is to be retained. However, since only one bull is required for servicing about 35 to 40 cows and heifers, the petitioner is not able to use all of the bulls that are born on the farm, and as a consequence he has a surplus of bulls each year. Heifers of the Brown Swiss breed can usually be bred at an age of between 15 and 18 months, dependent on the size and weight. The petitioner prefers to have them weigh about 900 pounds before being bred so that they will develop into cows weighing approximately 1,400 pounds when mature. Bulls of the Brown Swiss breed are generally bred at about 15 months of age. The following is a statement of the number of cattle the petitioner had on hand at the indicated dates, the number raised, the number *133 purchased, and the number sold during the years after holding for six months or more: Sold after
holding
Pur-
six months
On hand
Raised
chased
or more
On hand
Jan. 1, 1948 - 241
103
6
55
Dec. 31, 1948 - 283
Jan. 1, 1949 - 283
121
6
68
Dec. 31, 1949 - 258 During 1949, 32 head of cattle were lost by death. The following is a statement by classes of the number of cattle sold during 1948 and 1949 which had been held by petitioner for six months or more and the amounts received therefor: 1948
1949
Receipts
Receipts
No.
from sales
No.
from sales
Cows bred and used for milking: Age at date of sale - 24 months
1
$ 79.84
28 months
1
233.79
36 months and over
9
$ 4,011.35
19
4,536.79
9
$ 4,011.35
21
$ 4,850.42
Heifers: Bred but did not drop calf prior to date of sale
10
$ 4,000.00
1
$ 163.20
Not bred
3
185.00
3
625.00
13
$ 4,185.00
4
$ 788.20
22
$ 8,196.35
25
$ 5,638.62
Bulls: Used for breeding: Age at date of sale - 18 months
1
$ 500.00
21 months
2
$ 462.16
45 months
1
423.48
60 months
1
364.01
1
$ 500.00
4
$ 1,249.65
Not bred
32
8,009.21
39
9,346.04
33
$ 8,509.21
43
$10,595.69
Totals
55
$16,705.56
68
$16,234.31
*134 The following is a statement of petitioner's gross income from the sale of dairy products produced on the farm, from the sale of cattle raised on the farm, and the net loss resulting from farm operations, exclusive of the receipts from the sale of cattle, for the years 1948 and 1949: Net loss on
Gross income
farm operations
from sale
Gross income from
exclusive of receipts
Year
of dairy products
sale of cattle
from sale of cattle
1948
$48,466.42
$16,705.56
$21,050.10
1949
37,772.03
16,234.31
43,912.55
The Michigan Farmer is a farm magazine published twice monthly and has a circulation comprising a majority of the farmers in Michigan. In a section of that magazine entitled "Breeders' Directory" the petitioner advertised Brown Swiss bulls for sale twice monthly during the months of October 1948 through March 1949, the months of May 1949 through August 1949, and the last three months of 1949. In the early part of 1949 a similar advertisement was carried in the Prairie Farmer, a farm magazine published in Chicago, Illinois. The Brown Swiss Bulletin is published monthly in the interest of improving Brown Swiss cattle as a breed. Petitioner *135 had advertisements in nine issues of that magazine in 1948. Some of the advertisements were for the sale of bulls, others were for the sale of heifers and cows. Advertisements of petitioner's cattle also appeared in the March and April 1949 issues of the Brown Swiss Bulletin in connection with certain public sales of Brown Swiss cattle. The petitioner spent $337 in 1948 and $273.90 in 1949 in advertising his cattle. During 1948 and 1949 the petitioner exhibited cattle at various dairy cattle shows which were for showing purposes only, and not for sales purposes. Annually, each spring, there are cattle sales at Lake Mills, Wisconsin, to which petitioner occasionally consigns cattle for sale. The stationery used in connection with petitioner's farm carries the following heading: Gotfredson Farms Grass Lake, Michigan
Telephone, Grass Lake 5252 Breeders of fine Brown Swiss cattle. Gains from the sale in 1948 and 1949 of cattle which had been raised but held for less than six months were reported by petitioner as ordinary income. Gains from the sale of the cattle involved herein were reported by petitioner as long-term capital gains. In determining the deficiencies in controversy *136 the respondent determined that such gains constituted ordinary income. Opinion There is no controversy between the parties as to the amount of the Nolan indebtedness, or as to its being a non-business indebtedness. The controversy is as to whether it became worthless during 1948. In claiming that the indebtedness became worthless in that year the burden was on the petitioner to establish its worthlessness. From the evidence presented, we can not find that petitioner has discharged that burden. Aside from some shares of stock which were pledged as collateral for a bank loan, the petitioner admittedly had no knowledge as to whether Nolan owned other personal property or owned any real estate during 1948. Except for obtaining some credit information, from which he concluded that the company in which Nolan owned stock was operating at a loss and was having financial difficulties, the petitioner does not appear to have made any effort to ascertain whether the indebtedness owing to him by Nolan was collectible from other property of Nolan. He merely accepted Nolan's statement that he had no assets which he could use to pay petitioner. The record is silent as to the final work-out of *137 the bank loan and whether Nolan paid it and received back his stock. The fact that on two occasions prior to the instant loan the petitioner had made loans to Nolan, which were repaid according to promise, affords petitioner little aid here, in the absence of any showing as to the amounts of those loans and whether they were secured. Furthermore, the showing that there is no record of an administration of any estate of Nolan since his death in 1950 does not support a conclusion that he was unable during 1948 to pay his indebtedness to petitioner. From the record before us, we are unable to find that the indebtedness became worthless during 1948 and that the respondent erred in disallowing a deduction therefor for that year. The remaining issue is whether the gains realized by petitioner on the 55 head of cattle sold in 1948 and the 68 head sold in 1949 constituted long-term capital gains under the applicable provisions of the Internal Revenue Code, [1] as petitioner contends, or were ordinary income, as the respondent determined. The disposition of that question depends upon the determination of the factual question of whether the cattle were held by the petitioner for dairy purposes, *138 as he contends, or were held by him primarily for sale to customers in the ordinary course of business, as the respondent contends. *139 The petitioner's position is that all cattle at the time of birth and until they are sold are to be regarded as held for dairy purposes within the intendment of section 117 (j) (1). However, the evidence shows that the petitioner operates his farm in a manner which results in the sale of a large number of bulls before they have been bred or even have reached the usual breeding age and also in the sale of a substantial number of heifers before having been bred, or if bred before they have dropped a calf. Under the petitioner's standards for the retention of heifers which have dropped a calf, and under his standards for the retention of bulls which have sired offspring, some animals of these classes are sold at or near the beginning of their milk-producing or procreational life. Considering the petitioner's method of operation and the standards employed in determining whether cattle will be retained by him for milking and breeding purposes in connection with the fact that petitioner by his stationery held himself out as a breeder of fine Brown Swiss cattle and further regularly advertised cattle for sale, we think his position that all cattle from birth to sale were held for dairy *140 purposes is untenable and cannot be sustained. As a consequence the problem before us is to determine which heifers and bulls under the petitioner's method of operation and standards of selection for milk-producing and breeding purposes are to be regarded as having been held by petitioner for dairy purposes. A similar question was presented in Walter S. Fox, 16 T.C. 854, affd. (C.A. 4), 198 Fed. (2d) 719. The taxpayer there was engaged in breeding cattle and the question there was to determine what cattle were members of his breeding herd. We held that heifers which dropped a calf while still owned by the taxpayer were to be regarded as a part of the breeding herd. As to bulls, we held that only those which had reached the age at which it could be satisfactorily determined that they possessed the necessary breeding qualities for such a herd as the taxpayer was raising (found to be 34 months) should be classified as a part of the breeding herd. Cattle not coming within one or the other of the foregoing classifications were held not to be part of the breeding herd, but to be cattle held by the taxpayer primarily for sale to customers. Subsequent to our decision *141 but prior to consideration of the case on appeal, section 117 (j) (1) was amended as indicated, supra, to define "property used in the trade or business" as including "livestock, regardless of age, held by the taxpayer for draft, breeding, or dairy purposes." In affirming our decision the court of appeals stated that the amendment did not affect the reasoning or conclusion reached by us since the controlling factor was the purpose for which the cattle were held. The respondent contends that the principles applied in the Fox case are applicable here, while the petitioner contends that the factual situation here presented is so different from that in the Fox case as to render the principles of that case inapplicable here. While we recognize that the Fox case involved cattle held for breeding purposes and the instant cases involve cattle claimed to have been held for dairy purposes, we fail to see how that or other factual differences pointed to by petitioner render the principles of the Fox case inapplicable here. Accordingly, we hold them to be applicable. Before a heifer can become a milker she has to drop a calf. Petitioner's heifers were first bred between 15 and 18 months of *142 age. With a gestation period of approximately nine months, they would be from 24 to 27 months of age at the time of their first calving. Unless they then produced at least approximately 300 pounds of butter fat annually or were of lines of good producers of butter fat, they were disposed of. On the basis of the foregoing it would appear that they would be about 36 to 39 months of age before petitioner determined to retain them for milk-producing purposes. With bulls usually being bred at about 15 months of age, and not until their offspring begin milking is petitioner finally able to determine whether the bulls meet the petitioner's standards for retention, it appears that they would have to be from 48 to 54 months of age before the petitioner determined to retain them. In view of the foregoing it appears that cows under 36 months of age and bulls under 48 months of age could not have attained the petitioner's minimum standards for retention. Accordingly, we hold that cows which were 36 months of age or more, and bulls which were 48 months of age, or more, at the time of sale, were held by petitioner for dairy purposes and that the gain on their sale is taxable at capital gain rates. *143 Cows and heifers which were less than 36 months of age and bulls which were less than 48 months of age, at the time of sale, were not held by the petitioner for dairy purposes but instead were held for sale to customers. The gain on their sale is taxable as ordinary income. Decisions will be entered under Rule 50. Footnotes
1. SEC. 117. CAPITAL GAINS AND LOSSES. (a) Definitions. - As used in this chapter - (1) Capital Assets. - The term "capital assets" means property held by the taxpayer (whether or not connected with his trade or business), but does not include stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, or property, used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23(1), or an obligation of the United States or any of its possessions, or of a State or Territory, or any political subdivision thereof, or of the District of Columbia, issued on or after March 1, 1941, on a discount basis and payable without interest at a fixed maturity date not exceeding one year from the date of issue, or real property used in the trade or business of the taxpayer; * * *
(4) Long-Term Capital Gain. - The term "long-term capital gain" means gain from the sale or exchange of a capital asset held for more than 6 months, if and to the extent such gain is taken into account in computing net income; * * *
(j) Gains and Losses from Involuntary Conversion and from the Sale or Exchange of Certain Property Used in the Trade or Business. - (1) Definition of property used in the trade or business. - For the purposes of this subsection, the term "property used in the trade or business" means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23(1), held for more than 6 months, and real property used in the trade or business, held for more than 6 months, which is not (A) property of a kind which would properly be includible in the inventory of the taxpayer if on hand at the close of the taxable year, or (B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business. Such term also includes timber with respect to which subsection (k)(1) or (2) is applicable. Such term also includes livestock, regardless of age, held by the taxpayer for draft, breeding, or dairy purposes, and held by him for 12 months or more from the date of acquisition. * * *
Section 117(j)(1), as here set out, contains amendments made thereto by section 324 of the Revenue Act of 1951. By the provisions of section 324 the holding period for livestock for taxable years beginning prior to January 1, 1951, remained at six months or more. The holding period of 12 months or more for livestock was made applicable to taxable years beginning after December 31, 1950.↩